**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

CLINTON GEARY,            )
                          )
            Plaintiff,    )
                          )
      v.                  )        1:15CV00579
                          )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social  )
Security,                 )
                          )
            Defendant.    )

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Clinton Geary, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 11 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Memorandum), Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

**I.  PROCEDURAL HISTORY**

Plaintiff applied for SSI, alleging a disability onset date of June 1, 2005. (Tr. 204-07.) Upon denial of that application initially (Tr. 71-81, 121-24) and on reconsideration (Tr. 82-98, 127-31), Plaintiff requested a hearing de novo before an

Administrative Law Judge ("ALJ") (Tr. 132-34). Plaintiff (proceeding pro se), his friend Gary Joyce, and a vocational expert ("VE") testified at the hearing. (Tr. 36-70.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 99-113.) The Appeals Council thereafter granted Plaintiff's request for review and remanded the matter back to the ALJ for further consideration of (1) Plaintiff's cognitive impairment; and (2) the testimony of Gary Joyce. (Tr. 117-20.) Following that remand, Plaintiff amended his onset date to August 16, 2010, the date of his SSI application. (See Tr. 278.)

The ALJ held a second hearing, which Plaintiff, his attorney, and a VE attended (Tr. 417-50), and again ruled that Plaintiff did not meet the requirements for disability under the Act (Tr. 9-31). The Appeals Council then denied Plaintiff's request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] has not engaged in substantial gainful activity since August 16, 2010, the application date.
>
> . . .
>
> 2. [Plaintiff] has the following severe impairments: cervical degenerative disc disease; scoliosis of the thoracic spine; hypertension; major depressive disorder; panic disorder; a personality disorder, with antisocial features; psychotic disorder, not otherwise specified; mild intellectual deficits; and cannabis abuse.

2

. . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4. . . . [Plaintiff] has the residual functional capacity to perform medium work . . ., except that he can occasionally balance or climb ramps and stairs; he can never climb ropes, ladders, and scaffolds; he should avoid concentrated exposure to hazards; and he should have no more than moderate exposure to noise. He retains the mental residual functional capacity to perform unskilled work that is simple, routine, and repetitive in nature; he can adapt to only routine changes in the work environment; he can perform no work that is production-oriented; the work should be learned by demonstration; he can have occasional contact with coworkers and supervisors for the completion of job tasks; and he can have no contact with the public.

. . .

5. [Plaintiff] is unable to perform any past relevant work.

. . .

9. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

10. [Plaintiff] has not been under a disability, as defined in the [] Act, since August 16, 2010, the date the application was filed.

(Tr. 14-31 (bold font and internal parenthetical citations omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). In this case, Plaintiff has not shown entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

(quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[1] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work

---

[3]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ performed an improper listing analysis" (Docket Entry 13 at 2);

2) "[t]he ALJ improperly evaluated [Plaintiff's] credibility" (id. at 8); and

3) "[t]he ALJ improperly evaluated opinion evidence" (id. at 12).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 15 at 3-20.)

### 1. Listings 12.02, 12.04, and 12.08

In Plaintiff's first issue on review, he asserts that the ALJ "failed to give an adequate explanation as to why [Plaintiff's mental impairments] d[id] not meet relevant listings 12.02

---

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

['Organic Mental Disorders'], 12.04 ['Affective Disorders'], and 12.08 ['Personality Disorders'']," and that "substantial evidence supports that he does meet these listings." (Docket Entry 13 at 2.) In particular, Plaintiff contends that, contrary to the ALJ's moderate findings (see Tr. 20), the record established that Plaintiff had marked difficulties in social functioning and concentration, persistence, or pace ("CPP"), such that he met the criteria for the listings in question. (See Docket Entry 13 at 5-8.) Plaintiff's contentions lack merit.

"Under Step 3, the [Social Security Administration's SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in appendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford v. Colvin, 734 F.3d 288, 293 (4th Cir. 2013) (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal bracketed numbers omitted). "The listings set out at 20 CFR pt. 404, subpt. P, App. 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted). "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917

Case 1:15-cv-00579-CCE-LPA   Document 16   Filed 05/27/16   Page 9 of 31

F.2d at 160 (citing <u>Zebley</u>, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); <u>see also</u> <u>Zebley</u>, 493 U.S. at 530 ("An impairment that manifests only some of those criteria [in a listing], no matter how severely, does not qualify."). To meet Listings 12.02 and 12.04, Plaintiff must satisfy <u>either</u> the criteria in paragraphs A <u>and</u> B, <u>or</u> the criteria in paragraph C, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.02, 12.04, and to meet Listing 12.08, Plaintiff must demonstrate that his personality disorder meets all of the requirements of paragraphs A <u>and</u> B of that listing, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.08.[5]

Pursuant to Listings 12.02B, 12.04B, and 12.08B, Plaintiff must show that his mental impairments:

B. Result[] in at least <u>two</u> of the following:

1. Marked restriction of activities of daily living; or

2. <u>Marked</u> difficulties in maintaining social functioning; or

3. <u>Marked</u> difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration[.]

---

[5] The ALJ here apparently assumed, without explicitly finding, that Plaintiff's mental impairments satisfied the criteria of the "A paragraphs" of Listings 12.02, 12.04, and 12.08. (<u>See</u> Tr. 19-20.) Moreover, Plaintiff does not challenge the ALJ's finding that Plaintiff's mental symptoms do not meet the criteria in the "C paragraphs" of Listings 12.02 and 12.04. (Docket Entry 13 at 2-8; <u>see also</u> Tr. 21.) Accordingly, the relevant inquiry focuses on whether substantial evidence supports the ALJ's findings with respect to the "B paragraphs."

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.02B, 12.04B, 12.08B (emphasis added). In this context, to qualify as "marked," a limitation must "interfere seriously with [one's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C); see also 20 C.F.R. § 416.920a(c)(4) (explaining that "marked" represents the fourth-highest of five levels, below "extreme," but above "none, mild, [and] moderate").

### a. Social Functioning

As primary support for a finding of moderate limitation in social functioning, the ALJ gave "significant weight" to state agency psychological consultant Dr. Tovah M. Wax's opinion. (Tr. 20; see also Tr. 90.) The ALJ then cited specific record evidence to further support the moderate limitation in social functioning:

> In social functioning, [Plaintiff] has moderate difficulties. [Plaintiff] has reported that he has difficulty being around other people, does not like crowds, and does not like talking to people he does not know. However, he spends time with his mother, brothers, and sisters, and occasionally talks with his neighbors. He also has friends, including Gary Joyce, who testified at his first hearing. In October 2012, [Plaintiff] testified that he went to church every three to four months.

(Tr. 20.)

Notably, Plaintiff did not dispute the accuracy of the testimony and other evidence upon which the ALJ relied in finding moderate limitation in social functioning. (See Docket Entry 13 at 5-6.) Instead, Plaintiff points to other record evidence (not

11

expressly cited by the ALJ) as proof of a marked limitation in this area. (Id.) More specifically, Plaintiff points to (1) consultative examiner Dr. Dennis G. Egnatz's description of Plaintiff as "argumentative" (Tr. 294) and "not a good listener" (Tr. 296); (2) consultative examiner Dr. J. Craig Hunt's opinion that Plaintiff had marked limitation in his ability to "[i]nteract appropriately with the public" and "[r]espond appropriately to usual work situations and to changes in a routine work setting" (Tr. 396); (3) Dr. K.G. Reddy's observation that Plaintiff maintained "poor eye contact" and that his "sense of paranoia was evident" (Tr. 406); (4) Counselor Laura Evans's notation that Plaintiff angered easily and had homicidal ideations (Tr. 412); and (5) consultative examiner Dr. Kimberly A. Kirkland's opinion that Plaintiff could "likely" not "relate appropriately to fellow workers and supervisors" (Tr. 403). (See Docket Entry 13 at 6.)

Although the evidence Plaintiff cites arguably could have supported a finding of marked limitation in social functioning, none of that evidence compelled such a finding. First, Dr. Egnatz performed a physical consultative examination of Plaintiff (see Tr. 294-97) and thus he did not offer his observations regarding Plaintiff's argumentative demeanor and poor listening skills as part of a mental status examination or in conjunction with any restrictions on Plaintiff's abilities to perform mental work-related abilities (see Tr. 294, 296). Dr. Hunt, in turn, made

12

clear that he based his statements about "marked" limitations in Plaintiff's ability to deal appropriately with the public and workplace changes on Plaintiff's subjective "history of interpersonal difficulty" (Tr. 396), and the ALJ gave Dr. Hunt's opinions "little weight" because they originated from "examinations where [Plaintiff] did not fully cooperate and was found to be malingering" (Tr. 28). Further, Dr. Reddy recorded Plaintiff's "poor eye contact" and "paranoia" at the onset of an acute episode of mental disturbance (Tr. 406), but, after three days of inpatient treatment, Plaintiff denied any further hallucinations or depression (Tr. 407).

Like Dr. Hunt, Counselor Evans did not observe Plaintiff angering easily or displaying homicidal ideation – rather, she noted that Plaintiff "reported becoming easily angry" and experiencing "in the past [homicidal ideation] while angry." (Tr. 412 (emphasis added).) As a final matter, Dr. Kirkland opined that Plaintiff "would likely be unable to relate appropriately to fellow workers and supervisors" in the same section of her report in which she stated that Plaintiff "may be malingering (i.e., deliberately exaggerating) his emotional difficulties in the hopes of gaining disability benefits." (Tr. 403.) Consistent with that conclusion, the ALJ gave Dr. Kirkland's opinions "little weight" because her examinations reflected the possibility that Plaintiff exaggerated his symptoms. (Tr. 28.) Accordingly, as the ALJ supported the

13

moderate limitation in social functioning with substantial evidence, Plaintiff did not contest the accuracy of the evidence upon which the ALJ relied, and Plaintiff did not describe any evidence that compelled the ALJ to find a marked limitation, Plaintiff has not shown entitlement to remand on this front.

### b. CPP

The ALJ gave "significant weight" to state agency psychological consultant Dr. Wax's opinion that Plaintiff had moderate limitation in CPP (Tr. 20; see also Tr. 90), and then provided the following, additional supporting analysis:

> With regard to [CPP], [Plaintiff] has moderate difficulties. [Plaintiff] has reported having difficulties with his memory and concentration. However, [Plaintiff] watches television and listens to the radio, and used to attend church, all of which require sustained concentration. As noted in this decision, his examining doctors documented some deficits in his ability to sustain concentration, but they also reported that he was being resistant and uncooperative to the examinations, with possible malingering. These observations give less credence to their findings of decreased concentration.

(Tr. 20.)

Plaintiff asserts that "watching television and listening to the radio arguably do not require sustained concentration," and that "the fact that [Plaintiff] used to attend church in the past is irrelevant." (Docket Entry 13 at 7 (internal quotation marks omitted).) In addition, Plaintiff describes "objective medical evidence," not cited by the ALJ in the B paragraph analysis, that supports a marked limitation in CPP: (1) Dr. Hunt's opinion that

14

Plaintiff "demonstrated problems with [CPP]" and "may have moderate or greater difficulty tolerating the stress associated with day-to-day work activity" (Tr. 329-30); (2) Dr. Kirkland's opinion that Plaintiff could likely not "tolerate the day-to-day stress and pressure associated with daily work activity" and could not "sustain concentration and lack[ed] the mental ability to perform simple repetitive tasks" (Tr. 403); and (3) Dr. Reddy's observation that Plaintiff could not "function on a normal basis because of his current hallucinatory phenomena" (Tr. 406). (See Docket Entry 13 at 7-8.)

To begin, Plaintiff's challenge to the ALJ's reliance on Plaintiff's ability to watch television, listen to the radio, and attend church as evidence of his ability to concentrate has some merit. An individual can watch television or listen to the radio passively, and Plaintiff's testimony and other statements neither clarified how actively he performed these activities, nor for how long he performed them (see Tr. 58, 324, 400, 413, 437-38); as a result, such activities provide little to no support for Plaintiff's ability to sustain concentration in necessary increments to engage in substantial gainful activity, see, e.g., Hesselroth v. Colvin, Civ. No. 11-1417 (JRT/JJK), 2013 WL 1935079, at *9 (D. Minn. Mar. 27, 2013) (unpublished) ("The ALJ noted that [the claimant] watches television without reported concentration difficulties, but failed to note that there are no indications that

15

[the claimant] does **not** become distracted when watching television or explain how his ability to watch television would translate into the capacity to concentrate for prolonged periods of time in a work setting." (emphasis in original)). Similarly, Plaintiff testified at his first hearing that he attended church "every blue moon" (Tr. 59), and at his second hearing that he had stopped attending church at all (Tr. 439-40). Such sporadic participation in church activities does not lend much (if any) support to a conclusion that Plaintiff could maintain his concentration in a work setting. See Santos v. Astrue, No. CV 12-00694-OP, 2013 WL 816480, at *4 (C.D. Cal. Mar. 1, 2013) (unpublished) ("That [the p]laintiff can engage in leisurely or sporadic activity does not prove that he can maintain the concentration and pace sufficient to perform sustained work activity.").

However, despite those flaws, the ALJ ultimately supported the moderate limitation in CPP with substantial evidence. As noted above, the ALJ gave "significant weight" to Dr. Wax's opinion that Plaintiff had moderate limitation in CPP. (Tr. 20.) Moreover, the ALJ specifically addressed the opinions of Drs. Hunt and Kirkland upon which Plaintiff relies, and discounted them because of their contemporaneous reports of Plaintiff's resistance, lack of motivation and effort, and possible malingering. (Id. ("These observations give less credence to their findings of decreased concentration."); see also Tr. 28.) As for Dr. Reddy's

16

observation, he made clear that Plaintiff could not "function on a normal basis because of his <u>current</u> hallucinatory phenomena" (Tr. 406 (emphasis added)), but, after three days of treatment, Plaintiff denied any further hallucinations or depression (Tr. 407). Thus, because the ALJ supported the moderate limitation in CPP with substantial evidence, and Plaintiff did not proffer evidence that required the ALJ to adopt a marked limitation, Plaintiff's attack on the ALJ's CPP finding does not warrant remand.[6]

In conclusion, Plaintiff's first assignment of error fails to warrant relief.

## 2. Credibility Assessment

Next, Plaintiff asserts that "[t]he ALJ improperly evaluated [Plaintiff's] credibility" with regard to his mental symptoms. (Docket Entry 13 at 8.) More specifically, Plaintiff contends that "the ALJ appeared to credit some, but not all, of [Plaintiff's] complaints because the ALJ accounted for some of them in his [sic] RFC," while "fail[ing] to explain why she credited th[o]se limitations based on [Plaintiff's] complaints, but not others" in violation of <u>Mascio v. Colvin</u>, 780 F.3d 632, 639-40 (4th Cir.

---

[6] Even assuming, <u>arguendo</u>, that the ALJ erred in not finding a <u>marked</u> limitation in CPP, Plaintiff would still not prevail on his first assignment of error. To meet Listings 12.02, 12.04, or 12.08, Plaintiff must show that he had <u>marked</u> limitation in at least <u>two</u> areas of functioning. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.02B, 12.04B, 12.08B. As discussed above, the ALJ supported the moderate limitation in social functioning with substantial evidence, and Plaintiff has not contested the ALJ's findings in activities of daily living or decompensation. (<u>See</u> Docket Entry 13 at 2-8.)

2015).  (Docket Entry 13 at 9 (citing Tr. 23).)[7]  Plaintiff's argument falls short.

Social Security Ruling 96-7p, <u>Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements</u> ("SSR 96-7p"), 1996 WL 374186 (July 2, 1996), as applied by the Fourth Circuit in <u>Craig</u>, 76 F.3d at 594-95, provides a two-part test for evaluating a claimant's statements about symptoms.  "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'"  <u>Id.</u> at 594 (quoting 20 C.F.R. § 404.1529(b)).  Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which they affect his or her ability to work.  <u>Id.</u> at 595.  In making that determination, the ALJ:

> must take into account not only the claimant's statements about her pain, but also all the available evidence, including the claimant's medical history, medical signs, and laboratory findings, any objective medical evidence of pain (such as evidence of reduced joint motion, muscle

---

[7]    Plaintiff further faults the ALJ for over-reliance on Dr. Kirkland's "malingering" opinion and for an erroneous evaluation of Dr. Wax's opinions. (Docket Entry 13 at 11-12.)  However, because these arguments relate to the ALJ's treatment of opinion evidence, the Court should analyze them in conjunction with Plaintiff's third assignment of error, which concerns the ALJ's evaluation of opinion evidence (<u>see</u> Docket Entry 13 at 12-17).

spasms, deteriorating tissues, redness, etc.), and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Id. (internal citations and quotation marks omitted).

In this case, the ALJ found for Plaintiff on part one of the inquiry, but ruled, in connection with part two, that his statements "concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely credible for the reasons explained in [the ALJ's] decision." (Tr. 24.) In making that part two finding, the ALJ discussed Plaintiff's testimony and mental health treatment and the objective findings relevant to Plaintiff's mental impairments in a fair degree of detail. (See Tr. 24-27.) With regard to the objective evidence, the ALJ noted as follows:

. . . [Plaintiff] has been diagnosed with major depressive disorder; panic disorder; a personality disorder, with antisocial features; psychotic disorder, not otherwise specified; and cannabis abuse. However, the evidence of record indicates that [Plaintiff] has received very little assessments or treatment for these conditions, other than the consultative examinations. [Plaintiff] underwent multiple psychological consultative examinations, in May 2011, November 2012, and July 2014. These examiners documented significant findings related to [Plaintiff's] depression, anxiety, personality disorder, and cannabis abuse. They also documented possible mild intellectual disability. However, each examiner documented problems related to [Plaintiff's] motivation and cooperation with the examination. . . . [Plaintiff] was afforded the benefit of multiple consultative examinations to evaluate his mental health allegations. However, the examiners consistently documented questionable motivation and cooperation, and suggested malingering. The undersigned therefore finds

19

their reports and conclusions to be not persuasive, as the evidence indicates that [Plaintiff] was exaggerating his limitations for the purposes of his disability application. This conclusion is also consistent with the physical examination of Dr. Egnatz, who reported that [Plaintiff] was difficult to assess because he resisted and did not cooperate with full motor cooperation. Despite [Plaintiff's] exaggerated presentation at these examinations, the consultative examiners reported that [Plaintiff] had normal speech and motor activity; he demonstrated contact with reality; his thoughts were logical, sequential, and reality based; he did not appear to suffer from unusual preoccupations, obsessions, phobias, delusions, ideas of reference, suspicions, or disturbances of concept formation.

Other than the consultative examinations, there is very little, if any objective medical evidence of record indicating that [Plaintiff] was experiencing mental health symptoms until March 2013. In October 2010 and February 2012, his treatment notes from Forsyth Medical Center and Martinsville Memorial Hospital indicate that he had a normal mood and affect. On March 27, 2013, [Plaintiff] was hospitalized at Memorial Hospital of Martinsville after he reported having auditory hallucinations. However, [Plaintiff] was given medications and was reported to have a fairly rapid resolution of his symptoms. Only three days later, Dr. Walsh reported that [Plaintiff's] mood and affect were doing well. [Plaintiff] reported that he was not feeling depressed, and he was not having any auditory hallucinations. Dr. Walsh reported that [Plaintiff] was stable for discharge. More than a year later, in June 2014, [Plaintiff] received some treatment from Piedmont Community Services. On June 27, 2014, Dr. Tessmann reported that [Plaintiff] continued to report auditory, visual, and tactile hallucinations. However, [Dr. Tessmann] noted that [Plaintiff] had a generalized vagueness reporting of his symptomatology. [Dr. Tessmann] also reported that [Plaintiff] had not followed through with treatment recommendations. [Dr. Tessmann] reported that [Plaintiff's] speech was organized and coherent; and there was no flight of ideas or loose associations. [Dr. Tessmann] reported that [Plaintiff's] intellectual functioning was estimated in the normal range, but was probably in the lower half as exampled by his academic

performance. [Dr. Tessmann] assigned [Plaintiff] a GAF score of 60.[8]

(Tr. 26-27 (internal citations omitted).)

Contrary to Plaintiff's allegations, the ALJ, through the foregoing analysis, created "an accurate and logical bridge," Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000), from the evidence to her conclusion that Plaintiff's complaints regarding his mental symptoms "[we]re not entirely credible" (Tr. 24). Moreover, the ALJ's detailed mental RFC makes clear which of Plaintiff's reported mental symptoms the ALJ credited. (See Tr. 20.) Further, Plaintiff does not specify which of his mental symptoms the ALJ should have accounted for in the RFC or otherwise demonstrate how a more thorough credibility analysis would have favorably impacted the outcome of his case. (See Docket Entry 13 at 2-8.) Under these circumstances, Plaintiff's credibility challenge fails as a matter of law. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social Security] case in

_____

[8] The GAF is a numeric scale from 0 to 100 representing a clinician's judgment of an individual's social, occupational and school functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM-IV-R"). A GAF of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV-R 34 (bold font omitted). A new edition of the leading treatise discontinued use of the GAF. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").[9]

### 3. Opinion Evidence

Next, Plaintiff argues that the ALJ improperly evaluated the opinions of consultative examiner Dr. Kirkland and state agency psychological consultant Dr. Wax. (See Docket Entry 13 at 11-17.) Those contentions do not warrant relief.

### a. Dr. Kirkland

Plaintiff raises two issues with respect to the ALJ's analysis of Dr. Kirkland's opinion. (See Docket Entry 13 at 11-12.) First, Plaintiff asserts that the ALJ's decision erroneously suggests that more than one consultative examiner used the term "malingering" to describe Plaintiff, whereas in actuality only Dr. Kirkland included that term in her report. (Id. at 11 (citing Tr. 26, 403).) Second, Plaintiff points out that Dr. Kirkland referred to "Mr. Wall" rather than Plaintiff in her statement regarding malingering and that "it is unclear if notes from a different patient were

---

[9] Plaintiff's reliance on Mascio misses the mark. (See Docket Entry 13 at 9.) The Mascio court found erroneous an ALJ's reliance on the "boilerplate" language that "the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment," holding that such language "gets things backwards" by implying that the ALJ first determined the RFC, and then used the RFC to decide the claimant's credibility. Mascio, 780 F.3d at 639. The ALJ here, however, did not use that forbidden language in assessing Plaintiff's credibility. (See Tr. 24.) Moreover, the Mascio court concluded that the ALJ's use of such language would nevertheless constitute harmless error if the ALJ had "properly analyzed credibility elsewhere," Mascio, 780 F.3d at 639, and, as discussed above, the ALJ here properly analyzed Plaintiff's credibility.

22

incorrectly placed in this report, or if [Dr. Kirkland] was actually referring to [Plaintiff]." (Id. (citing Tr. 403).)

As to the first of those matters, Plaintiff takes issue with the ALJ's statement that the consultative "examiners consistently documented questionable motivation and cooperation, and suggested malingering" (Tr. 26 (emphasis added)), to the extent that it could imply that more than one examiner found malingering a possibility (Docket Entry 13 at 11). The grammatical structure of the sentence in question, read in isolation, could lead the reader to infer that more than one examiner used the term malingering. However, and more importantly, in the ALJ's discussion of the consultative examinations, she did not specifically attribute a "malingering" opinion to anyone other than Dr. Kirkland. (See Tr. 16-18, 22, 26, 28.) Thus, read in context, the ALJ's decision does not suggest that more than one consultative examiner found malingering.

Regarding Plaintiff's other point, Dr. Kirkland's report does refer to "Mr. Wall" rather than Plaintiff in the sentence containing the reference to "malingering." (Tr. 403.) However, Dr. Kirkland made other statements in her report referencing Plaintiff's lack of effort and motivation (see Tr. 398 (observing that Plaintiff "appeared irritable and frustrated," "often said he did not know," and gave "little effort on mental status evaluation")), which indicates that Dr. Kirkland's use of the name "Mr. Wall" in her statement on "malingering" constituted a simple,

typographical error. More significantly, Dr. Kirkland conducted her examination on July 23, 2014 (see Tr. 398), and Plaintiff's counsel denied having any objections on October 20, 2014, when the ALJ proposed to enter Dr. Kirkland's report, along with the other exhibits of record, into evidence (see Tr. 419-20). If Plaintiff had bona fide concerns regarding whether Dr. Kirkland's statement about malingering actually referred to Plaintiff, his counsel could have (and should have) voiced those concerns before the ALJ, who could have recontacted Dr. Kirkland for clarification, see 20 C.F.R. § 416.919p(b). Plaintiff's failure to raise this issue before the ALJ undermines any claim of prejudice at this late juncture. See Stepinski v. Astrue, No. CA 11-183 ML, 2012 WL 3866678, at *9-10 (D.R.I. Aug. 6, 2012) (unpublished) ("The [c]ourt views unfavorably the silence of [the] [p]laintiff's counsel at the hearing regarding the [error] about which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances. This [c]ourt is disinclined to provide such an incentive. Accordingly, the [c]ourt finds that [the] [p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)), recommendation adopted, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) (unpublished).

In sum, no basis for remand exists with regard to the ALJ's evaluation of Dr. Kirkland's opinions.

b. Dr. Wax

Plaintiff levels three challenges to the ALJ's evaluation of Dr. Wax's opinions. (See Docket Entry 13 at 12-17.) First, Plaintiff notes that "[t]he ALJ's statement that she gave 'partial weight' to Dr. Wax's opinion in [the RFC] analysis is inconsistent with her assignment of 'significant weight' to this same opinion during her listing analysis." (Id. at 12 (citing Tr. 20, 27).) Second, Plaintiff draws attention to the ALJ's next sentence which starts, "The undersigned has" and then "cuts off, leaving the court to wonder what more, if anything, may have led the ALJ to th[e] conclusion" to give Dr. Wax's opinions partial weight. (Id. (citing Tr. 27).) Finally, Plaintiff argues that the ALJ erroneously found Dr. Wax's opinions consistent with the record as a whole, because Dr. Wax issued his opinions on May 16, 2011, "and d[id] not address eight other records that make findings regarding [Plaintiff's] mental impairments." (Id. (citing Tr. 296, 324-30, 377, 390-92, 395-96, 398-403, 406-07, 409-15).)

As an initial matter, and contrary to Plaintiff's allegations, the ALJ did not give both "partial weight" and "significant weight" to the "same opinion" from Dr. Wax (Docket Entry 13 at 12 (emphasis added)); rather, she gave "significant weight" to Dr. Wax's assessment of the "B paragraph" criteria at step three of the SEP (Tr. 20), and gave "partial weight" to Dr. Wax's mental RFC in conjunction with her own RFC determination (Tr. 27). Merely by

according "significant weight" to Dr. Wax's "B paragraph" findings, the ALJ bound herself neither to give significant weight to the remainder of Dr. Wax's opinions, nor to adopt all of his findings whole cloth. See Bennett v. Colvin, No. 3:13-CV-01176, 2015 WL 153950, at *13 (M.D. Tenn. Jan. 12, 2015) (unpublished) (holding that ALJ who accords great weight to opinion not required to adopt that opinion wholesale); Razey v. Colvin, No. 14-23, 2014 WL 4792150, at *2 (W.D. Pa. Sept. 23, 2014) (unpublished) (ruling that ALJ not required to adopt a medical opinion wholesale); Lambert-Newsome v. Astrue, 2012 WL 2922717 at * 6 (S.D. Ill. July 17, 2012) (unpublished) (noting that merely because ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale"); Irvin v. Astrue, 2012 WL 870845 at * 2-3 (C.D. Cal. March 14, 2012) (unpublished) (finding that, although ALJ gave great weight to medical source opinion, he did not err in implicitly rejecting one limitation from that opinion).

Plaintiff next argues that a reviewing court cannot determine the basis for the ALJ's decision to give partial weight to Dr. Wax's mental RFC, because the paragraph at issue ends with a cut-off sentence containing only the words, "The undersigned has." (See Docket Entry 13 at 12 (citing Tr. 27).) However, comparing the ALJ's mental RFC with Dr. Wax's mental RFC makes clear that the ALJ found Plaintiff's mental limitations greater than those offered by Dr. Wax. (Compare Tr. 23, with Tr. 94-95.) Although the ALJ

26

adopted most of Dr. Wax's restrictions (i.e., limitation to simple, routine, repetitive tasks, preclusion of production-oriented work, restriction to occasional interaction with supervisors and coworkers), the ALJ added a restriction that Plaintiff have no contact with the public. (Tr. 27.) The inclusion of a significant, additional restriction adequately explains why the ALJ gave Dr. Wax's mental RFC only partial weight.[10]

Lastly, Plaintiff attacks the ALJ's decision to give "significant weight" to Dr. Wax's opinion that Plaintiff's mental impairments did not meet the criteria of any listings, and the ALJ's corresponding finding that Dr. Wax's opinion "[wa]s consistent with a preponderance of the evidence." (Docket Entry 13 at 13 (citing Tr. 20).) Plaintiff emphasizes that Dr. Wax offered that opinion on May 16, 2011, prior to "eight other records that make findings regarding [Plaintiff's] mental impairments." (Id. at 12 (citing Tr. 296, 324-30, 377, 390-92, 395-96, 398-403, 406-07, 409-15); see also id. at 13 ("At [the time of Dr. Wax's May 16, 2011 opinion], Dr. Hunt's first consultative examination from May 6, 2011, was the only mental health record available for Dr. Wax's review.") Plaintiff contends that those subsequent mental health

---

[10] In the same sentence, the ALJ gave "partial weight" to both Dr. Wax's mental RFC and to state agency medical consultant Dr. E. Woods's physical RFC. (Tr. 27.) Just as the ALJ added another mental restriction to Dr. Wax's mental RFC (compare Tr. 23, with, Tr. 94-95), the ALJ supplemented Dr. Woods's physical RFC (i.e., including no climbing ladders, ropes, and scaffolds, occasional balancing, and no more than moderate exposure to noise) (compare Tr. 23, with Tr. 92-93).

records reflect that he suffered "more than moderate[ limitations in] social functioning and [CPP]." (Id. at 13.)

Plaintiff's argument that Dr. Wax's opinions should not have received significant weight because Dr. Wax provided such opinions prior to the record's completion runs counter to logic. State agency consultants who provide RFC determinations at the initial and reconsideration levels of the claims process necessarily give their opinions prior to completion of the record, and their opinions would not, under Plaintiff's reasoning, ever warrant significant weight.

Moreover, Plaintiff's position contradicts both binding and persuasive authority. Such authority makes clear that the consistency of state agency consultant's opinions with the record as a whole, including those records post-dating such opinions, constitutes the proper focus of the inquiry. See Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) (holding ALJ may rely on opinions of non-examining physicians when such opinions find consistency with whole of record); Thacker v. Astrue, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011) (unpublished) ("The fact that the state agency physician did not have access to the entire evidentiary record — because the record was incomplete at the time of the assessment — is inconsequential as the ALJ considered the entire evidentiary record and substantial evidence supports his determination." (internal citation omitted)); Bryant v. Astrue, No.

3:08CV719, 2009 WL 6093969, at *9 & n.11 (E.D.Va. Jul. 15, 2009)
(unpublished) (affirming ALJ's decision to give non-examining state
agency consultants' assessments great weight as "consistent with
the actual medical findings and conservative treatment of the
claimant's treating physicians, and with [the claimant's] admitted
activities of daily living" even though such consultants "did not
have the opportunity to observe the claimant or the opportunity to
consider additional evidence submitted subsequent to their review
of the record").[11]

Finally, the mental health records post-dating Dr. Wax's
opinion do <u>not</u> reflect a worsening of Plaintiff's mental
impairments or limitations beyond those adopted by the ALJ. For
example, Dr. Hunt's November 26, 2012 evaluation of Plaintiff
yielded similar diagnoses and GAF scores when compared to his May
6, 2011 examination (<u>compare</u> Tr. 329, <u>with</u> Tr. 391), and both
reports highlighted Dr. Hunt's concerns that Plaintiff lacked
motivation and failed to give a full effort on examination (<u>see</u> Tr.

_____

[11] Plaintiff's reliance on <u>Johnson v. Barnhart</u>, 434 F.3d 650 (4th Cir. 2005)
(<u>see</u> Docket Entry 13 at 12) misses the mark. Plaintiff cites <u>Johnson</u> for the
proposition that "[a]n ALJ may give an opinion of a non-examining physician
'significant weight' if the non-examining physician 'thoroughly reviewed [the
claimant's medical records, the objective medical evidence supports [the
physician's] conclusion, and [the] opinion is consistent with the other medical
opinions.'" (<u>Id.</u> (citing <u>Johnson</u>, 434 F.3d at 657).) However, the <u>Johnson</u> court
merely held that "the ALJ properly awarded [the independent medical examiner's]
opinion significant weight because [(1)] [the examiner] thoroughly reviewed [the
plaintiff's] medical records[;] [(2)] the objective medical evidence supports
[the examiner's] conclusion[;] and [(3)] his opinion is consistent with the other
medical opinions." <u>Johnson</u>, 434 F.3d at 657. Thus, the court found those three
facts a <u>sufficient</u> basis to support the ALJ's decision to accord significant
weight to the non-examining physician's opinion, but did <u>not</u> hold that such facts
constitute <u>necessary</u> circumstances that must exist before an ALJ can give
significant weight to a non-examining physician's opinion. <u>Id.</u>

324, 392). Dr. Kirkland's report contains similar diagnoses to Dr. Hunt's (compare Tr. 329, 391, with Tr. 402) and also observes that Plaintiff deliberately exaggerated his symptoms (Tr. 403). Moreover, although, on March 27, 2013, Dr. Reddy found Plaintiff "not able to function on a normal basis" as a result of Plaintiff's reported hallucinations (Tr. 406), after just three days of treatment, Plaintiff denied any further hallucinations or depression (Tr. 407). During subsequent mental health treatment in June 2014, Plaintiff's providers assigned GAF scores of 60 (see Tr. 410, 413), indicating only moderate (approaching mild) limitations in functioning, see American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

Under these circumstances, the ALJ did not err in giving Dr. Wax's listing opinion "significant weight" or in finding his opinions "consistent with a preponderance of the evidence" (Tr. 20). See Thacker, 2011 WL 7154218, at *6 ("[T]here is nothing in the additional medical evidence subsequently submitted by Plaintiff to indicate that she possessed limitations beyond [the state agency physician's RFC]."); Bracey v. Astrue, No. 5:07-CV-265-FL, 2009 WL 86572, at *3 (E.D.N.C. Jan. 6, 2009) (unpublished) (finding no error in ALJ's reliance on state agency consultants' opinions where "treatment notes and clinical findings . . . submitted after the [consultants's] assessments indicate[d] similar complaints and assessments as those reviewed by the . . . consultants" and noting

that the ALJ considered the additional evidence, which did "not demonstrate a marked change for the worse in [the] plaintiff's health").

### III.  CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that judgment be entered for Defendant.


                    /s/ L. Patrick Auld
                    **L. Patrick Auld**
                    **United States Magistrate Judge**


May 27, 2016